Case No. 18-2022, Katrina McGrew v. Sgt. Duncan et al., argument not to exceed 15 minutes per side. Ms. Linda Fagans, you may proceed for the appellant. Good morning, Your Honor. Good morning. My name is Linda Fagans, and I'm here on behalf of the nine defendants in this case, and I'll reserve three minutes for rebuttal. Your Honor, the essence of the defendant's position is this, that these officers are entitled to qualify immunity because they did not use force. And we looked objectively on reasonable force in the context of this drug raid, and we know that the big question is, and our position is, that the district court erred in determining that all of these defendants should be held liable in this particular matter. The court knows that each—to establish a civil violation, each defendant must be judged on his own merits and that we must look at the conduct of these individual defendants. And the fact of mere presence in a participant's place does not mean that the plaintiff has established liability for a constitutional violation here in this particular case. And so our position is, is that when you look at the de novo, objectively as a matter of the law, the record, that the court erred. Now, the key case that plaintiffs rely on is Burley v. Gagetke. And our position is it's clearly distinguished. First, this is a case right here where this is not a case where the defendants are attempting to try to hide and hide some shield anonymity. Well, I mean, the case has a lot of similarity. I mean, I wrote the opinion in Burley. Yes. And in that case, you also had the officers coming in in mass, disguising their identity and not disclosing who they were. And I wrote the opinion there that said the burden actually switches to the defendants to establish that they were not there because they've actively given their identity. So why doesn't that apply here? You're saying that they haven't identified the defendants as who did this or did that, what, but since they're all actively hiding their identity from everybody, why shouldn't that case apply and the burden switches the defendants to establish they were not the ones there? Because in this particular case, one big key factor is here, and we can't dismiss it when you look at the totality of the circumstances and you look at the record, and this is the same thing that the court, the district court dismissed when they looked. During the deposition, Plaintiff specifically stated, and you look at PD 1053, yes, she stated their eyes were covered and she couldn't see, but then she unequivocally says this, that she says they were all dressed in black and, you know, she says, okay, and you can see their eyes. So they asked, was it a white guy or a black guy? She responds, a black guy, 6'2", medium. Now, you know in this case you have, I think, four white guys, two Asians, and four blacks. And I might have the math a little wrong here. And she said the light-skinned black guy, you know how tall he was, 6'2", was male, medium. You cannot dismiss that. So four white police officers, that doesn't prove, this doesn't establish as a matter of law that they violated anybody's constitutional rights here in this particular case. And this is not in you and Wiley's or Your Honor's or my own perspective or the opinion, but you left to the judgment of the district court whether or not you applied that Ninth Circuit court case about burden shifting. So it wasn't like that that was establishment. You did not say that's the way the Sixth Circuit would determine that. In fact, you see, I leave no, I make no decision about how that district court will determine that. So it wasn't saying like that's established law for the Sixth Circuit. You refer to that in this particular case. And it's not necessary in this case. They have to, in this particular case, all the defendants, and it shouldn't be this burden shifting. It shouldn't apply. So that's our position. They identify themselves. In fact, they show their picture. You see their faces in this brief. She especially in light of the fact they did it when she said, I saw their eyes here. And the fact that she mentions about voice recognition that they had in Burleigh that the plaintiffs relied on in this case, we don't have that, although she says she might could do that at trial. That was Burleigh when they entered into their opinion. They were talking, they had a trial here. Qualified immunity, the whole purpose of it is not to foreclose the burden of having defendants, police officers, government officers to go to court to avoid the stress, the burden, the cost of litigation here. And this case is not necessary in this particular matter. This is not a case where they were just trying to hide some subterfuge. There's not a case where they're saying the whole problem with one problem that you had in that case with Burleigh was they were saying, they were like, guess who? We weren't there. That was the whole position. No one is denying that. No one is saying this. And you notice the lack of the party. Have the defendants admitted which one did the acts here, excessive force? No, they have not. They have not. One of them did, but they're all denying it. They haven't. So they should all have qualified immunity because somebody is lying, obviously, and yet the plaintiff's version of the facts happened. And at this point, we have to accept that for jurisdiction in the civil laboratory appeal. Yes. Your Honor, we're taking and we're not contesting facts. We're relying on the facts that the plaintiff did. So we know that four white persons and two Asians with white complexion definitely are not. This is probably your best argument. I mean, Burleigh, we did remand it to allow the district court to determine whether they wanted to adopt it in that sort of case. Maybe we should have specifically adopted it in this case. And I'd probably be in favor of doing it. And we're certainly allowed to do it. So why shouldn't we? You shouldn't because I think either you have a clear record when you look at the totality of the record and based on the plaintiff's case, it's unequivocal about who she said the one person, one, who was – the one person who need her was this guy that was black, that was 6'2". And that's why – this is not the mix of our times. All right. So should we eliminate the Caucasian? The Asian. We're up to the what, the five or six African-American defendants. Three or four. Let them stay in the case and the burden on them would be approved. Well, two of the black defendants should not be in the case because she stated unequivocally they were 6'2". They're not tall. Yes. And the record shows they were 5'7 and 5'9". Now, Plaintiff, you have to – you can't dismiss, Your Honor, and the district court as it did can't dismiss, as it said, by consensus of light skin. She was unaffordable. No one – there's been no – nothing that has – she has not come back and changed her position here. So the two that are 5'7 and 5'9 shouldn't be in here either. I want to shift gears.  Yes. I'd like to shift gears to the issue of the handcuffing and whether or not the handcuffing is clearly established. Well, what level of handcuffing? So the issue is, Morrison, is the case establishing what seems to be a bright-line rule? Okay. Your Honor, in this particular case, our position is, as was established, is that even though you had Morrison in 2009 and this case happened in 2014, that there has still – the context – you have to look at – for qualified immunity, you can't look at it as high-level generality. Yes, if you can prove that tight handcuffing can cause some type of bruise or marks and so forth. But we're also looking at qualified immunity gives officers who act objectively reasonable. This is a drug-raid case, and the point was to recover not just drugs but firearms here. The search warrant has been upheld. It was valid. Even the district court has said that you cannot find anything wrong with the search warrant in this particular case. And when you look at cases like Marcellus v. Tom Redford – this case I argued here before this court in 2012 – and you look at the other cases, in a drug-raid case, that you have to balance the evidence about the fact that in terms of the necessity for handcuffing, for pointing guns, to come in with force, to take the stand. The cases like in Sinclair v. Atkin, I stated here – that I raised in here – it says although only tight handcuffings can constitute excessive force, we cannot conclude that it was clearly established that the officer's failure to moose the plaintiff's handcuffs in that case was unreasonable or that he's not entitled to it. They talked about the whole idea about drugs and the character of it. Was there a request in that case? I mean, there was a request in this case. Yes, there was a request, but – And the response by the officer was yelling obscenity, I think. Yes, but yelling obscenity, which was rude. But yelling obscenities is not a constitutional violation. Rude, negative, and remember the court has ruled that there's been no bad faith in this case. What I'm going to say, too, that it wasn't necessarily apparent in the context of this case that it was unreasonable. You have that case – This is what I was asking. I'm sorry. Our case is the only case – Morrison, it seems like a bright line. But since then, this court has ruled in various other cases that seem to question whether or not that ought to be the bright line. So I'm wondering if you want to – Yes, and I was going to get to that. I was leading to that. I'm sorry. Okay. So what it is is that just in – I wrote it on here. I'm going blank now. Yes, the fact that after Morrison, there were cases like that we cited in that brief, the Fetters case, O'Malley, where the – was – you can establish as a matter of law that handcuffing was a constitutional violation. And the context, especially when you're talking about drug rape, all three of those cases question that. They came out one after – We're not talking – Kelsey, we're not talking about handcuffing or not handcuffing. We're talking about the level of injury. The level. The type. Handcuffs. The fact that someone – You need to wait until the judge finishes. Okay. Yes, Your Honor. It's not just – it's Judge Griffin, too. You're speaking over us. Okay. So I'd like to settle that a little. Okay? We're asking about the level of injury that results from handcuffing, and that is what I'm asking you to address. Yes. The level of injury in those cases there, they even stated it. Even some minor bruising in one of the cases is Fetters, and I forget – O'Malley. It was the O'Malley case. The fact that it was even a bruise does not prove per se that the level of force was objectively unreasonable, Your Honor. I'm sorry to move so fast, but I guess I'm answering your questions and trying to anticipate you instead of waiting and moving. But here there was medical treatment because of the handcuffing, was there not? That she went to the hospital, but there was no – to see about her, she did go to the hospital. She was treated at the hospital, too, wasn't she? Treated for – he looked at her wrist, but there was no further treatment. There's nothing in the record that says she particularly received any kind of medication or there was any long-term permanent injury. That was not established in the record. It's not in the record. But that's not required by the case law either, is it? But we're saying that after Morrison, as Judge Cook has asked me, those cases indicated that some – even in one case, O'Malley says that even if it's some bruising, that doesn't – in the context, we look at the whole totality of the circumstances, Your Honor, that that does not mean that there was unreasonable force in this particular case. One of these factual issues, and that's kind of one of the problems I have in your position, is that you don't seem to be accepting the plaintiff's version of the facts. You're arguing the facts, and you're saying that these facts, as the way my clients say it, don't establish a violation of that. We can't do that in a laboratory, can we? Your Honor, first of all, I disagree with you. First of all, I am not arguing the facts. I'm stepping back. I'm not arguing the facts. No, I'm not. It's the severity of the injury. I think it's the different facts in the cases. Yeah, if you talk about the severity of the injury, I said that I didn't – I'm not – I'm saying that the case law didn't say something. Some of the cases said that even if it's a bruise and nothing more, did not establish. So I'm not arguing the facts. She had a bruise. I'm not saying it wasn't a bruise. She went to the doctor. I admitted that. What I'm saying that it was not apparent to a competent police officer under the Hambring v. Maybring. They said if reasonable officers had disagreed, they're entitled to qualified immunity whether that conduct. I'm not saying that there was no bruise. I'm not saying that – I'm saying that under the facts of this particular case law – It might not have been a nonconstitutional injury. Right. Was the plate also thrown on – thrown to the floor? I beg your pardon? Was she thrown to the floor by one of the officers? She was. She was. Yes. And that's one of the claims of excessive force, is it not? Your Honor, if you look at the district court's action and – yes, it is. But if you look at Sinclair, in a drug raid, the court leaves leeway for officers to come in. Remember this search warrant said they watched several transactions that have not been attacked. They were also looking for firearms, and they were looking – she also had a male person there in the basement. The officers in this case, under the totality of the circumstances, not questioning facts, were – actions were not unreasonable in this particular case. If you look at Marcellus – and I argued that case – they pushed – they knocked the bandage off a man down. They put handcuffs on him. Yes. And then, unfortunately, they cussed him out, and they did some other things. But the court looked at the totality of the circumstances in Marcellus, and they determined – and Sinclair in notes talks about that. They determined that the qualified immunity – they were entitled to qualified immunity under the totality of the circumstances. And you have to look at, from the police to a police officer, a position in here in this particular case. The search warrant hasn't been attacked in this particular case. All right. You're out of time. You can use your bubble now if you'd like or – I'll wait. Okay. Any further questions? No. All right. Let's hear it from the plaintiffs. Good morning, Your Honors. I'm going to make two points. One of them the defense is going to help me make with their brief. And then if there are no questions, I'll simply relinquish my time and sit down. Point number one is the facts, as alleged by the plaintiffs in this case, by Ms. McGrew, clearly established that this was excessive force. And again, the facts have to be accepted at this time, at this point in the appeal, that what she's saying is true, that she was thrown out to the ground, that she was kneed, that she was handcuffed so tightly that she had bruising and went to the hospital for it, where bruising was found at the hospital. Did the district court make a ruling on the throwing to the ground, whether that was entitled to be qualified or not? That's not mentioned in the opinion. I thought that was odd. I thought it was odd as well, but I think that what the court was doing was the court was simply saying that the defense loses on this and the plaintiff survives on that fact alone. If you allege four or five, six facts and one of them is enough, courts do it all the time. They say we're going to decide issue number one. We don't have to decide issue number one. Because there was no ruling on the throwing to the ground, would it be prudent for us to remand that issue to the district court to make a ruling on it or not? Only if it's necessary. Only if it's necessary to – if it would change the outcome of the ruling. Because we already have the handcuffing. We both know that in the scenario of a drug raid with multiple adults in the house and all the information the officers had, we're not going to be sweet about the whole thing. So do we know anything that it didn't necessitate that the person wasn't resisting, that they needed to get that person out of the way? I just don't know. Normally we have that developed in some way and particularly by the district court before we get all exercised about that. So I'll tell you two things. Yes. The first thing is that my client's testimony is that she was sitting there not resisting, not fighting, not doing anything, and everything that happened to her was completely unprovoked. That's number one. On November 25th, 2014, the record shows that this officer was not working on that day. This warrant is the most blatantly false warrant. Oh, okay, but I didn't know we weren't. We're not. We're not. No, but just because the defense has raised that this was a good faith warrant and they were acting in good faith, the faith of the officers comes in. These officers clearly were not acting in good faith there. That's the only reason I'm mentioning that. I know it doesn't really come into qualified immunity. You say that they're clearly not acting in good faith, and I'm not sure how you back that up. Well, the way the whole— We need a record. Well, it's in Officer Moore's deposition transcript, which come to think of it right now, I don't believe I attached because I didn't think it was necessary for qualified immunity. So I'll withdraw that argument. I'll completely move on from there. But based on the statements that were made that are in the record, according to what my client testified to, the way that they acted towards her, the way that they spoke to her, the way that they treated her, the threat to go into her backyard— No, that's—these are not polite encounters. Does one need to be polite? You don't have to be polite at all, and they never are. So you're acting like we should add that to the program. No, that's not what I'm saying. What I'm saying is that there's a difference between not being polite and threatening to go and shooting a chained dog in the backyard. There's a difference between the two. One shows bad faith. One shows good counsel. Threatening or shooting. That's what her testimony was. They threatened the dog. They threatened her that they were going to go kill her dog, which was chained in the backyard. She didn't cooperate. Yeah. Can I ask you this, the business about the description that she gave of the officer that handcuffed her? At that point, she was on the floor, and do I remember that she's face down on the floor? Correct. And so when they cuffed her, they pulled her arms behind it and cuffed her? Is that what happened? Correct. Okay. But then they did sit her up. She got treated for that? She got treated for that. She got treated for bruising on the wrists? On the wrists. Correct. Okay. Did she get injured, orthopedically injured? There was no subsequent treatment. That's what you're asking. There was no tears and breaks. When that was happening, they didn't break her arm or anything? Thankfully, in this case, they didn't. So she's sitting up, and at that point, she has the opportunity to look at the people that are there and assess what's going on physically, the description of it. Except for the fact that they're dressed all in black with masks. Yeah. The emphasis on the 6 feet 2 inches high is what I'm trying to get at. If you're face down or even if you're sitting, it's very difficult to tell how tall someone is. And some officers are so short that all we know is it's up there somewhere. It is. It is. And to prove that, I would tell you that there were definitely officers there. She was definitely handcuffed. And if we take the defendant's claims at face value, nobody was 6'2". Does that mean this whole thing never happened? If her identification has to be spot on and perfect, then obviously the whole thing never happened because nobody was 6'2". Right? She was just trying to ask a question. And that's why it's particularly funny that the judge said that the description was not so perfect. This is the point that I'm actually going to rely on the defendants to help make for me. On page 27 of their brief, they refer to one of the officers as brown-skinned black man, not light-skinned black man. Now, if you ask 100 different people, describe this person. I don't know if they would say light-skinned, brown-skinned, light-ish, a little bit light, kind of white, a little bit dark. It's very difficult to say, and that's why Judge Denise Page Hood actually said that this is not something that you can put that much emphasis on, given the fact that you're seeing very little of them. It's their eyes. And it's very difficult to tell the shade of their skin in these circumstances. Does anybody know what the purpose is of going in all black with only your eyes showing? What does that accomplish? There's nothing in the record about this. Do you want me to try to answer it, though? I have my views based on my experience with these kinds of cases. There seems to be two general explanations. One is that there are times that they don't want their identities to be known, because if they are about to do a drug bust, some of the times the people going in are undercover police officers, and they're people who have actually been working with these people, and they don't want their identities to be known just yet. So that is a good reason. Obviously, the bad reason is because they don't want people to know who they are in case one of them decides to aggressively manhandle a woman. And then we get to the court of appeals saying, well, you don't know who did that to you, and nobody's 6'2", so we can qualify them even. And that's why the other thing, the only other point I wanted to make, was Gagecki, which I know this panel is quite familiar with, particularly Judge Griffin. And I think this case falls squarely under Gagecki. It's not exactly factually the same, but it's very, very similar. The law is going to be the same. And then the very last point is that the Morrison, for something that Judge Koch mentioned about whether this should actually be upheld or not, Morrison, there was a petition for a cert sent to the Supreme Court in 2015, and it was denied in 2016. So that's the law. That's the law of the land. That's the law we're going to have to deal with until then. Has this case gone to our mediation officers? Yes, it has. Would there be any benefit of having them look at it again? I mean, you prevailed low, but, you know, you're just talking money damages at this point. Would there be any advantage of having mediation look at it again? I'm going to answer this question very guardedly and cautiously because I know that this is not a settlement conference. There are two issues that I think are going to stop settlement in this case. Number one, several of these police officers must be stopped. They must be stopped. I'm on board with that. My client is as well. And having the city pay us a lot of money is not going to change that. A verdict and a judgment is mine. Bringing these things out is mine. That's a good reason not to. This is the city of Detroit Police Department, right? Correct. I think that was the other case too, wasn't it? Yes, I believe so. It just seems like it's a practice in the city of Detroit, which I find outrageous, by the way. But it seems like it's continuing. And so I appreciate your thoughts on that. Well, that is why I was curious because I've never heard of this before, except – The city of Detroit. The city of Detroit. The city of Detroit. Unless there's any other questions, I'm going to push my pen and sit down. Thank you. Thank you all. All right, three minutes to go. Your Honor, I want to point out that in the judge's opinion, page 17 and P.D., page 1d, page 164, one thing she said, there's not a dispute whether defendant officers were activated in effect pursuant to a valid search warrant and within the scope of their employment here. And that is so – in terms of the fact that when we're talking about the objective reasonableness of these officers' conduct in here, whether or not you like the fact you're not here to question their policy, where you have to look objectively from officers who do this daily, not from the sanctity of your courtroom, about how they handle these drug raids in these particular cases. They can be very ugly in this case. I read that statement as going to their good faith and relying upon a search warrant, not necessarily their good faith in their conduct in executing the search warrant. It's a search – but the point is – No, no. Am I wrong in that? I read that period. She didn't say they acted in bad faith in this particular case. No, they acted in good faith, relying upon the search warrant to enter the premises, but not necessarily their conduct. Your Honor, you may interpret it that way, yes. Okay. Okay. She did, but in terms of the conduct, she felt that it was – She felt it was – What did you want to say? Judge, what were you saying? I'm sorry. It did read – that quote you read does read that it is they're acting in good faith on this warrant. Right. Okay. So it seems like it's restricted to that. To that. To that. And so, Your Honor, in this particular case, now you lack – and that goes through the whole issue of the conversion here. There is no – if you look at the facts here, there is nothing established that the officers took the gun. The guns were part of the search warrant, and the evidence, we're looking at what plaintiff states, that she didn't even know where her diamonds rings were or earrings were for two weeks. She hadn't seen them two weeks before the search warrant. So that doesn't have an implication that they converted something in this case, in this intentional tort cases and so forth. And the – we disagree in that you can determine as a matter of law that the handcuffing was not ministerial in the context of this case. When you're talking about – if we're talking about drug raids and how the cases have established that you must take, that in terms of how you handle a drug raid case, that you're allowed to handcuff persons, you're allowed to take authority and so forth, this was not a ministerial act. They went in – this was – in Oliver, the plaintiff relies on that was a – talking about a plaintiff arrest. This is in the context of a drug arrest. They came in and they placed it – they placed the handcuff on her. This was not a ministerial act that they – because if you look at the definitions you use, you're following orders or you're just executing manned orders. I don't think that was the case in here, and so we would argue that as a matter of law. Why does the city of Detroit conduct drug raids in this manner where they conceal the identity of their officers and they refuse to disclose the names of these officers during the raids? Why does the city of Detroit do that? Your Honor, for the protection of the police officers, and that is that. But that's not done in every case. That's not – I've handled many drug cases. There's a period of retribution after the raid. And they are afraid of that, Your Honor. Is that – you mean protection of the officers? Yeah, for the protection and safety of the officers during the raid and identification. And since we were bringing in our subjective viewpoints, my brother was a police officer, hit man, shot gun man in these drug cases. And he was shot. He was shot as a hit man. Fortunately, he lived, but he became a disabled police officer. So in this case, one of the reasons why later they came about was because he was identified as one of the people who went into the drug raid. But they do not do this in every case. You have some cases where they do, just like – and whether it's relevant to you or not. Len Moore stated he never wears a mask. And he's targeted later. Is that because of the identity? Yes, yes, yes. He lived. So those – We're very sorry about that, Brother. Any further questions? No. No, thank you. The case will be submitted. I think that concludes the report. I'll hand it to Dr. Creste to make a adjournment report.